1  JAMES A. QUADRA, State Bar No. 131084
   REBECCA COLL, State Bar No. 184468
2  QUADRA & COLL, LLP
   649 Mission Street, Fifth Floor
3  San Francisco, CA  94105
   Telephone: (415) 426-3502
4  Facsimile: (415) 625-9936

5  Attorneys for Plaintiff John Doe

6

7                    UNITED STATES DISTRICT COURT

8                   NORTHERN DISTRICT OF CALIFORNIA

9

10

11  JOHN DOE,                              Case No.:

12              Plaintiff,                 **COMPLAINT**

13       v.                               **1. Sex Discrimination in Violation of Title IX**
                                          **2. Breach of Contract**
14  STANFORD UNIVERSITY; ROES 1-50,       **3. Breach of the Covenant of Good Faith**
    inclusive,                            **and Fair Dealing**
15                                        **4. Negligence**
                Defendants.               **5. Intentional Infliction of Emotional Distress**
16
                                          **DEMAND FOR JURY TRIAL**
17

18          Plaintiff John Doe alleges:

19                              **PARTIES**

20          1.      Plaintiff John Doe ("John Doe") is a competent adult and was an undergraduate

21  student at Defendant Stanford University at all relevant times.  Given the sensitive nature of this

22  action involving sexual conduct, and by agreement with Defendant Stanford University which

23  knows the true identity of Plaintiff and the students involved, John Doe is using fictitious names

24  of the students and witnesses involved in this action.  (*See Doe v. Lincoln Unified School Dist.*

25  (2010) 188 Cal. App.4th 758, 766 [recognizing plaintiff's right to use fictitious name to protect

26  legitimate privacy rights].)

27

28

                                          1

2.  Defendant Stanford University ("Stanford") is a well-known institution of higher learning located within the jurisdiction of this Court, such that venue is proper in this Court.

3.  The identity and capacity of the persons or entities sued as Roes 1 to 50, inclusive, are presently unknown to John Doe, who reserves the right to amend this Complaint.

## JURISDICTION AND VENUE

4.  This Court has federal question jurisdiction pursuant to 28 U.S.C. §1331 because this action arises under Title IX, codified at 20 U.S.C. §§1681 *et seq.*, as a result of Stanford discriminating against John Doe based on his gender in violation of Title IX.  This Court has supplemental jurisdiction over John Doe's state law claims pursuant to 28 U.S.C. §1367(a) because those claims are related to the Title IX violation and arise out of a common nucleus of operative facts, alleged below, so as to part of the same case or controversy under Article III of the United States Constitution.

5.  Venue is proper before this Court under 28 U.S.C. §1391 because Stanford is located in the Northern District of California and its wrongful actions against John Doe occurred in this District.

## EXHAUSTION OF REMEDIES FOR STATE LAW CLAIMS

6.  In order to exhaust his administrative and judicial remedies for his supplemental state law damages claims, concurrent with the filing of this action John Doe filed a petition for a writ of administrative mandamus pursuant to California Code of Civil Procedure §1094.5 or, alternatively, California Code of Civil Procedure §1085 ("Writ Petition") to challenge the final administrative decision made by Stanford on June 11, 2014 to suspend John Doe from attendance at Stanford and to impose additional sanctions on him.  The Writ Petition is currently pending before Santa Clara County Superior.  Although Stanford has concurred that the statute of limitations to bring this action is equitably tolled pending the outcome of the Writ Petition, Stanford has nonetheless refused to enter into a stipulation recognize and agreeing that such tolling is in effect.  Stanford further claimed that it intended to argue that Plaintiff is barred from bringing his claims based on the doctrine of laches.  In an abundance of caution and because of

Stanford's refusal to cooperate to efficiently enter a stipulation tolling the statute of limitations in this matter, Plaintiff has included his supplemental state law claims for damages in this action. Plaintiff intends to request that this Court stay this matter pending the outcome of Plaintiff's concurrently filed state court Writ Petition.

## FACTUAL ALLEGATIONS

### Introduction

7.      This action arises from a disciplinary action by Stanford against John Doe under Stanford's policies and procedures known as the Alternative Review Process ("ARP"), arising out of John Doe's alleged sexual assault of a person identified by the fictional name of "Jane Smith," whose identity is known to Stanford. The alleged sexual assault was in fact sexual conduct to which Jane Smith consented. Under the ARP, Stanford conducted a hearing where evidence was taken by Stanford through a review panel. This panel had discretion, as described in the ARP, to determine the facts of the case and make findings based on the factual determinations. Under settled law, John Doe had the right to a fair hearing and procedural due process in connection with disciplinary proceedings, but he was denied this right by Stanford both because the specific proceedings against John Doe were improperly conducted and because the ARP is fundamentally flawed as written so that it violated John Doe's right to a fair hearing. Rather than afford John Doe a fair hearing, Stanford repeatedly deprived John Doe of his right to a fair process because of his gender in order to protect Stanford's purported prestige and reputation against criticism that Stanford fails to adequately address alleged sexual assaults of women by men.

8.      Motivated by gender bias against John Doe, Stanford improperly asserted jurisdiction, then rushed to judgment against John Doe in disregard of the presumption of his innocence. Motivated by gender bias against John Doe, Stanford failed to carefully evaluate all of the relevant evidence - which revealed that John Doe did not sexually assault Jane Smith, who in fact consented to the sexual activity – and wrongly determined that John Doe committed sexual assault. Motivated by gender bias against John Doe, Stanford imposed penalties on John

Doe and then actually increased those penalties when he appealed the wrongful discipline without authority under the ARP.  Throughout the entire proceeding against John Doe, Stanford acted out a manifest bias against John Doe because he is male, and not with the intent to ascertain the truth in a fair proceeding that respected John Doe's rights to procedural due process.

9.     Moreover, Stanford's ARP policies and procedures as written, constitute gender bias against John Doe, since Stanford drafted and implemented the ARP with the intent of prosecuting successful sexual assault disciplinary proceeding against men.  Stanford intentionally drafted the ARP in order to increase prosecution of successful disciplinary proceedings against men for sexual assault and trained the students and staff involved in implementing the ARP in a manner that targeted men.

**The Alleged Incident**

10.     On January 1, 2014, John Doe engaged in consensual sexual conduct with a competent adult, identified by the fictitious name of Jane Smith, who removed her clothing, crawled into bed with John Doe, pressed her body against him and willingly consented to the sexual conduct.  Jane Smith's true identity is known to Stanford and may be confirmed by Stanford by contacting John Doe's attorneys of record.   Prior to this sexual conduct, John Doe and Jane Smith had been in a romantic relationship for about two and a half years and had previously engaged in consensual sexual activity together.  Jane Smith and John Doe were students at Stanford at the time of the sexual conduct on January 1, 2014.  However, this occurrence of consensual sexual conduct between Jane Smith and John Doe occurred on private property belonging to John Doe's family in another state that had no connection to Stanford. The private property is located over one thousand miles from the Stanford campus.  Jane Smith and John Doe were both on a winter break from Stanford on January 1, 2014 and were not participating in any program or activity connected to Stanford at the time of the sexual conduct. Thus, there was no connection between the consensual sexual activity that occurred on January 1, 2014 and any programs or activities conducted, sponsored or sanctioned by Stanford or

otherwise connected to Stanford.  In addition, the alleged sexual conduct in Juneau did not threaten the safety and integrity of the Stanford Community.

11.     The District Attorney's Office of Jane Smith and John Doe's home county which had jurisdiction over the matter ("DA"), conducted an extensive criminal investigation into the incident between John Doe and Jane Smith on January 1, 2014, including interviewing Jane Smith on numerous occasions.  After completing its investigation, the DA declined to prosecute John Doe, concluding that there was insufficient evidence of any sexual assault.

**Stanford's Failure to Provide a Fair Hearing Before Its Biased Review Panel**

12.     On January 7, 2014, Jane Smith filed a complaint with Stanford's Title IX Coordinator and the Office of Community Standards at Stanford, falsely alleging that she did not consent to the sexual conduct with John Doe on January 1, 2014.  Jane Smith's complaint is defined as a "Concern" under the ARP instituted by Stanford to address allegations of sexual assault, sexual harassment, relationship violence or stalking.  In addition to the ARP, Stanford's unduly complicated and vague disciplinary proceeding initiated against John Doe was also purportedly governed by at least two other written policies promulgated by Stanford: (i) the Student Judicial Charter of 1997 (as amended October 2013); and (ii) Administrative Guide §1.7 regarding sexual harassment.  According to the written ARP policies and procedures issued by Stanford, John Doe was to be afforded certain rights, including but not limited to:

a.     to be considered innocent until found responsible by a preponderance of the evidence by a review panel;

b.     receiving written copies of specific documents regarding the disciplinary process;

c.     meeting with a Stanford investigator and providing a written statement to the investigator;

d.     meeting with the review panel;

e.     listening to interviews by the review panel with Jane Smith and any witnesses;

f.     providing the reviewers with follow-up questions for Jane Smith and any witnesses;

g.      having his identity and the allegations kept confidential;

h.      appealing an adverse ruling by the review panel to the Vice Provost for Student Affairs;

i.      having a support person accompany him throughout the investigative and review process;

j.      being advised by an "impartial and confidential" Stanford counselor regarding the disciplinary process;

k.      receiving reasonable protection from retaliation, intimidation, harassment and/or malicious prosecution.

13.      On January 30, 2014, Jane Smith submitted a formal complaint against John Doe to Stanford's Office of Community Standards.  On April 9, 2014, more than two months later, John Doe was notified of the charges filed by Jane Smith and the referral of the matter to the ARP.  Under the ARP, an investigator (the "Investigator") was assigned to the matter and a panel of five "Reviewers," comprised of three students and two faculty or staff members (the "Panel"), conducted a series of evidentiary hearings pursuant to the ARP.  The investigative and evidentiary hearing process violated John Doe's right under Stanford's policies and procedures to fairness and procedural due process in several respects as described below.

14.      At the time Stanford advised John Doe of Jane Smith's false accusations against him, Stanford referred John Doe to a "counselor" to advise him regarding the process pursuant to the ARP.  Stanford failed to adequately inform John Doe of the counselor's alleged neutral role. As a result, John Doe mistakenly believed the counselor was his own advocate and thereby placed his trust and confidence in him.  Not only did the counselor not act with John Doe's best interest in mind, he was not neutral.  Acting contrary to John Doe's benefit, the counselor discouraged John Doe from having an attorney present throughout the process, which allowed Stanford to ignore John Doe's rights to a fair proceeding with impunity.  Unaware that the counselor was acting with Stanford's best interest in mind, John Doe followed that advice to his own detriment.  Although the ARP expressly allows a "responding student" who is under

investigation to have a "support person accompany him or her throughout the investigative and review process," Stanford's counselor discouraged John Doe from exercising his right of adequate legal representation, which materially affected the outcome of the disciplinary proceeding against John Doe.  A lawyer would have advised John Doe of the failures in Stanford's ARP and assisted him in obtaining a fair hearing.  In addition, despite the ARP language that acknowledges the right to "refuse to engage in self-incrimination," by discouraging John Doe from consulting with an attorney, Stanford was able to rush forward with the proceedings, knowingly preventing John Doe from obtaining legal advice regarding his Fifth Amendment and due process rights to seek to stay the Stanford proceedings pending the completion of the criminal investigation in Jane Smith and John Doe's home town triggered by Jane Smith's false allegations.  By contrast and as evidence of Stanford's gender bias against John Doe, Stanford allowed a Stanford law professor to represent Jane Smith and to improperly push for sanctions against John Doe.

15.     The Investigator and Panel conducted the investigation and evidentiary hearings without authority under Administrative Guide 1.7.3.1, which provides that Stanford will investigate allegations of "Prohibited Sexual Conduct" when either:  (i) the involved parties are Stanford students and "there is a connection between the allegations and University programs or activities;" or (ii) investigation and response are necessary for the proper functioning of the University, including the safety of the University community or preservation of a respectful and safe climate at the University."  Neither circumstance existed in this case.  The alleged sexual misconduct had no connection with Stanford programs or activities.  Furthermore, as alleged below, Stanford itself concluded that John Doe was "not a threat to the [Stanford] community," so there was no evidence that Stanford's "proper functioning" required further investigation.  These failures demonstrate that Stanford improperly proceeded in excess of its own prescribed jurisdiction because of gender bias against John Doe in Stanford's discriminatory zeal to prosecute sexual assault claims.  Stanford never should have proceeded with the disciplinary proceeding against John Doe, but instead should have deferred to the criminal investigation.

16.     Despite the lack of jurisdiction under Administrative Guide §1.7.3.1, Stanford negligently investigated John Doe and conducted flawed evidentiary hearings which further violated John Doe's right to fairness and procedural due process.  For example, Stanford prevented John Doe from asserting evidence and raising arguments in his defense.  Although John Doe had the right to present written statements and evidence to the Panel under the ARP, his statement was heavily redacted by Stanford's Investigator without his consent, and he was denied the right to present evidence directly relevant to Jane Smith's credibility and her emotional and mental state.  In doing so, Stanford denied John Doe the right to effectively confront Jane Smith regarding her false accusations and raise factual issues relevant to his defense.  Stanford, through its Investigator, wrongfully told John Doe that statements relating to Jane Smith' credibility were not relevant and Stanford excluded them from evidence.  The Investigator violated her alleged neutral role and unilaterally decided what evidence was relevant and could be presented to the Panel, supplanting the Panel as the trier of fact regarding the relevance of evidence.   Furthermore, in a case where there were no witnesses and the credibility of the parties was a key issue, the Panel declined to consider evidence presented by John Doe impeaching Jane Smith's credibility and her emotional/mental state when the Panel was provided the opportunity to do so.   In addition, despite his right under the ARP to be considered innocent until proven responsible by a preponderance of the evidence, Stanford denied John Doe a fair hearing by prohibiting him from facing his accuser and denying him the right to cross examine her.

17.     In addition to improperly redacting John Doe's own statements and not providing his full statements to the Panel, Stanford redacted even the statements of his accuser where it disproved the allegations against him.  For example, the Panel did not consider repeated statements by Jane Smith suggesting that she was frustrated that she could never elicit an emotional reaction from John Doe when they were dating, which likely was part of her motivation to level devastating and false accusations against him.  Consistent with Jane Smith's apparent motive to retaliate against John Doe for their failed relationship by falsely accusing him

of sexual assault, Jane Smith complained to the Investigator that John Doe seemed uninterested in her and ignored her during their relationship.  However, Stanford's Investigator unilaterally decided this evidence was not "relevant," a decision that any fair hearing must reserve for the trier of fact, which at Stanford is the Panel not the Investigator.

18.     After the Panel was provided obviously incomplete information, it did not request clarifications so as to provide John Doe a fair hearing as was its duty under Stanford's policies and procedures.  Instead, the Panel rushed to judgment and rendered an unfounded ruling against John Doe.  On April 25, 2014 - only twelve business days after John Doe had been charged in the university process - the Panel incorrectly determined that John Doe had committed "sexual assault" and "sexual misconduct," as defined by Stanford Administrative Guide §1.7.3, when he engaged in consensual sexual activity with Jane Smith on January 1, 2014.  Acting out of a gender bias against John Doe, the Panel's rush to judgment denied him a fair opportunity to present a defense and all relevant evidence.  Furthermore, the Panel ignored its own duty to safeguard John Doe's right to a fair hearing and to be considered innocent until proven responsible by a preponderance of the evidence.  The Panel issued a Findings and Sanctions ("Findings and Sanctions"), allegedly pursuant to the ARP that erroneously concluded, contrary to the preponderance of the evidence, that Jane Smith did not consent to the sexual activity with John Doe that occurred on January 1, 2014.  The Panel's Finding is internally inconsistent and not based on a preponderance of evidence, which violated John Doe's right to fairness and procedural due process under Stanford's policies and procedures.  The Panel's Finding, which does not provide factual findings, deliberately failed to provide a rationale for the Panel's decision, in violation of ARP §V(A)(3), and failed to demonstrate a preponderance of evidence in favor of its findings.

19.     Ignoring its duty to provide John Doe a fair hearing, the Panel failed to question Jane Smith's credibility despite numerous inconsistencies and a repeatedly changing factual account.  For example:

a.   Jane Smith stated to the Panel that on the night of the incident she did not have

anywhere to stay.  This assertion was designed to suggest that John Doe took advantage of Jane Smith.  It was, however, untrue and its falsity is established by the statement of Witness A, Jane Smith's friend. Jane Smith was later forced to admit that she had been offered a place to stay by her Witness A.  These two inconsistent statements, and the statement from Witness A were given to the Panel and the Panel, nonetheless, disregarded this inconsistency.

b.  The Investigator and the Panel failed to obtain and/or take into account prior inconsistent statements made by Jane Smith to the Palo Alto Police Department ("PAPD").  Jane Smith told the PAPD that on the night of the incident she encountered John Doe while she was walking to his home on her way to "snuggle" with him.  Jane Smith thus stated her intent to spend the night with John Doe with, by her own admission, some consensual intimacy.  She also told the Palo Alto Police Department that she was upset that John Doe had "hooked up" with one of her friends, providing clear evidence of her ill motive to falsely accuse John Doe.  In her subsequent statements to Stanford she revised her story completely.  Under this new version, her encounter with John Doe occurred as a total coincidence as she was walking with another man to that man's home.  In creating this new version, Jane Smith also contradicted her previous claim that she had nowhere to sleep that night.

c.  Jane Smith described her relationship with John Doe during the time they were dating as "sexually abusive."  When asked about the nature of the alleged sexual abuse by a detective from the PAPD she admitted this purported "abuse" was John Doe's failure to perform oral sex on her.  Jane Smith's distorted claim of "abuse" clearly made her claims against John Doe suspect, yet the Panel ignored all evidence that put Jane Smith's credibility in question.

d.  Jane Smith's multiple explanations of how and why she removed her underwear during the January 1, 2014 event were convoluted, contradictory and lacked any credibility.

e.  It is still unclear as to which story Jane Smith ultimately settled upon to explain the removal of her underwear, or which of the many contradictory versions the Panel decided to believe.  What is clear, however, is that according to the medical examiner, who examined her just a few days after the alleged sexual assault supposedly occurred, there was no evidence at all of any abrasion, laceration, contusion or anything at all in the various areas where she said her underwear dug into her flesh in her competing narratives.  Indeed, the SART (forensics) exam which Jane Smith underwent on January 5, 2014 resulted in no evidence whatsoever of rape or any other form of assault.

f.  Jane Smith initially stated that she was not scared or afraid while John Doe was penetrating her, but became scared only after he told her "to go down on him."   She later changed her story and said that she was paralyzed by fear while he was penetrating her.  This new version was designed to contrive an explanation of why she did not voice any concern and in fact removed her own underwear.

g.  In one of her versions, Jane Smith stated that she took down her underwear

because she knew that it was inevitable that John Doe was going to penetrate her.  In addition, she stated that she did not know how to prevent John Doe from penetrating her. In complete contradiction to the foregoing, she also stated that she believed that John Doe would have stopped had she asked him to do so, which is an admission that Jane Smith did nothing to contradict John Doe's reasonable belief that Jane Smith had consented to the sexual activity.

h.   According to Jane Smith, in spite of her claim that she had just been raped, she fell asleep next to alleged perpetrator and in the morning reached over to him and asked, "Are you mad at me?"

i.   Later that day Jane Smith sent a text to John Doe in which she apologized to John Doe, saying, "I wont show up and get in your bed again. I am sorry I have put you in that situation a couple times. It wont happen again."  When asked about this text message Jane Smith purported to not see the relevance between it and her allegations. She then acknowledged its relevance but disingenuously claimed that it was not an apology to John Doe for putting him in a difficult position, but merely a statement of regret for putting herself in a position where John Doe could "take advantage of" her. In fact, in the week before the incident, Jane Smith went to his house, put on his underwear and crawled into his bed waiting for him to return to his home in the early morning hours. After arriving at home, John Doe told her that he was not interested in getting back together when she brought it up.

j.   Jane Smith told Stanford that on January 19, 2014 she saw John Doe arrive in the parking lot of her residence hall as a passenger in a car and that she saw him staring at her.  In contradiction to this, Jane Smith then told the PAPD that she did not see John Doe in the car because the windows were tinted and that she only later learned from her roommate that John Doe was in the car (which pulled into the parking lot briefly to drop off Jane Smith's roommate).  Moreover, her assertion that John Doe's brief passage through the parking lot of her residence hall as a passenger in a friend's car put her in great fear is totally contradicted by the numerous well-established subsequent incidences of Jane Smith attempting to meet with John Doe.

20.    In recent years, Stanford has faced significant criticism for failing to properly investigate allegations by female students claiming to be victims of sexual assault by male students.  Stanford's biased and unfair rush to judgment against John Doe was clearly a response to this criticism. Stanford's response violated its own policies and procedures by exceeding its jurisdiction, ignoring relevant evidence exonerating John Doe and instead choosing to rely on Jane Smith's contradictory and incredible allegations.  Based on its gender bias against John Doe, Stanford pushed forward with its purported "investigation" without waiting for the DA's more thorough criminal investigation to conclude, which was particularly improper in light of the fact that the prohibition of sex discrimination by educational institutions under Title IX, codified

at 20 U.S.C. §1681, does not apply to off-campus events unrelated to any University-sponsored event.  The Panel should not have considered the accusations by Jane Smith at all as it lacked jurisdiction under its policies and procedures and should have deferred to the DA investigation.  However, even if Stanford had jurisdiction to consider the matter, the Panel should have been thorough and methodical, beginning with waiting for the completion of the more thorough investigation performed by the DA, which had greater resources and vast experience in investigating these matters, as well as the expertise to perform a forensic evaluation to determine whether the facts as described by Jane Smith were credible or even medically possible to have occurred..  Had Stanford waited for the DA to complete its rigorous investigation, the Panel would have had the benefit of information gathered during that process and the DA's conclusion.  Instead, the process was biased against John Doe from the outset and the judgment of the Panel was rushed.

21.    On May 13, 2014, without completing a proper and thorough investigation, the Panel imposed disciplinary sanctions on John Doe in the Findings and Sanctions.   Under ARP §V(A)(3), the Findings and Sanctions had to state the Reviewers' "findings relating to the matter, their decision on the charges and their reasoning."  Without describing any specific factual findings or providing any reasoning, the Findings and Sanctions erroneously concluded that "based on a preponderance of the evidence that a sexual act occurred and that consent was not established."  The Panel not only did not consider all the relevant evidence as described above, but misapplied the standard of proof required under the ARP to provide John Doe a fair hearing.  Under ARP §V(A)(G), John Doe was "considered innocent until found responsible by a preponderance of the evidence."  Thus, the burden was properly on Jane Smith/Stanford to prove lack of consent.  Instead, as a result of its gender bias against John Doe, the Panel instead improperly placed the burden on John Doe to "establish" consent was given because he was a man accused of sexual assault.

22.    Under ARP §V(A)(4), the Findings and Sanctions had to state the Panel's "decision regarding the sanction and their reasoning."  However, without providing any factual

reasoning for the Panel's decision to discipline John Doe, the Findings and Sanctions included a five quarter suspension and consequent delay of John Doe's graduation, and a requirement that upon his return he would drop any class that Jane Smith chose to attend, would withdraw from any student activity in which she was a participant, and would not attend any event, or University-sponsored activity or trip where she was present, among other restrictions.  Thus, without any justifiable rationale, the Findings and Sanctions deprived John Doe of valuable property rights, including the right to graduate from Stanford without any restrictions or penalty. As described below, however, Stanford's Vice Provost actually increased the sanctions wrongly imposed on John Doe as part of the appellate process under the ARP in complete contravention of the Vice Provost's authority under the ARP.

### Stanford's Unclear Policies and the Vice Provost's Bias Deprive John Doe of a Fair Appeal

23.    As provided by the ARP, John Doe and Jane Smith separately appealed the Findings and Sanctions to Stanford's Vice Provost for Student Affairs, Greg Boardman.  The Panel's failure to provide factual findings to support it Findings and Sanctions against John Doe deprived him a fair opportunity to appeal to the Vice Provost as the exact basis for the Panel's findings against him were never revealed to him.  In a further violation of his right to a fair process, John Doe was not allowed to review Jane Smith's appellate submissions or to respond to those submissions, but was instead allowed only to review and respond to a "summary" of her submissions without any ability to determine the accuracy of the summary.

24.    The standards of appellate review of the Findings and Sanctions under ARP §XV(E) are so unclear and ambiguous as to constitute a prima facie violation of John Doe's right to fairness and procedural due process under the ARP, which clearly states that John Doe must be considered innocent until he is proven responsible by a preponderance of the evidence.  Under ARP §XV(E)(1)(a), the Vice Provost is to determine if the "proper facts and criteria [were] brought to bear on the decision," which requires the Vice Provost to make an independent de novo finding of the "proper facts," *i.e.,* the true facts, on an appeal.  Any other reading of the

standard would be based on pure speculation of the meaning of the ARP's language regarding the standard of review.  In contrast to the apparent de novo standard of review in ARP §XV(E)(1)(a), ARP §XV(E)(1)(c) states that the Vice Provost is to consider whether "[g]iven the proper facts, criteria and procedures, was the Reviewers' decision reasonable?"  The standard of review under this latter provision appears to be akin to the substantial evidence standard of judicial appellate review in which the Vice Provost's review is limited to determining whether the Panel acted reasonably based on the "proper facts" determined by the Panel.  Incredibly, neither §XV(E)(1)(a) nor §XV(E)(1)(c) asks the Vice Provost to determine if the Panel properly applied the preponderance of evidence standard when finding John Doe responsible.  To make matters worse, ARP §XV(E) states that "the review of appeals will usually be limited to" these "considerations," thereby creating a standard that is so unclear that it appears to give the Vice Provost license to do anything he or she desires in reviewing a Panel's decision, including ignoring exculpatory evidence and whether the proper standard of proof was applied.  In short, the ARP fails to state a clear standard of appellate review by the Vice Provost, which is which resulted in an appellate review that discriminated against John Doe because of his gender.

25.    Given the confusing and entirely inadequate appellate procedure and standards of appellate review stated in ARP §XV(E) and his obvious bias against John Doe, the Vice Provost not surprisingly abused his discretion and issued a flawed Appeal Outcome Decision on June 11, 2014 ("Vice Provost Decision") supporting the findings of the Panel that John Doe sexually assaulted Jane Smith.  The Vice Provost's involvement in the appeal process further violated John Doe's right to a fair hearing and procedural due process.  The arbitrary and inadequate appellate review is evident in the Vice Provost's Decision itself, which stated that the Vice Provost's "role [was] not to substitute [his] judgment for the reviewers.  [His] role [was] to ensure that the reviewers had a reasoned basis to act in the manner in which they acted."  Despite stating that he was not empowered to make factual findings, which apparently was based on ARP §XV(E)(1)(c), the Vice Provost nonetheless proceeded to make detailed factual findings that appeared nowhere in the Panel's insufficient Findings and Sanctions.  The Vice Provost's

1  unauthorized and unfounded finding of additional "facts" was an apparent attempt to make it

2  appear that "the proper facts and criteria were brought to bear on the decision," as stated in ARP

3  §XV(E)(1)(a).  In reality, the Vice Provost Decision is the result of the Vice Provost's bias

4  against John Doe because of John Doe's gender.

5          26.     In effect, given that the Findings and Sanctions lacked any factual findings

6  beyond the conclusory and flawed statement that "a sexual act occurred and that consent was not

7  established," the Vice Provost could not find that the Panel had a "reasoned basis" to issue the

8  Findings and Sanctions. The Vice Provost could also not conclude that the Panel properly found

9  John Doe at fault under a preponderance of the evidence standard since the factual basis for the

10  Panel's finding was not provided.  At that point, the Vice Provost was required to have the Panel

11  correct their many errors.  However, the Vice Provost instead took it upon himself to conduct his

12  own unauthorized investigation in an improper attempt to "find" evidence that he could use to try

13  to justify a biased finding against John Doe.  To that end, the Vice Provost initiated improper ex

14  parte contact with two of the Reviewers regarding the absence of a specific factual determination

15  in the Findings and Sanctions about John Doe's state of sleep and his purported claim of

16  "sexsomnia," a claim that John Doe never made before the Panel.  The Vice Provost admitted

17  that "it would have been helpful had the reviewers provided additional information," but he then

18  improperly attempted to excuse the lack of essential factual findings in the Panel's Findings and

19  Sanctions by making his own unauthorized factual findings, despite never questioning the parties

20  or any witnesses in order to evaluate their credibility.  In short, the Vice Provost Decision is a

21  muddled analysis that reflects the Vice Provost's obvious bias against John Doe and the

22  complete lack of a clear standard of review in ARP §XV(E) in violation of John Doe's right to a

23  fair hearing and procedural due process.

24          27.     In the Vice Provost Decision, the Vice Provost admitted that the Panel and he had

25  no legitimate basis to make any findings against John Doe by stating the matter to be

26  "exceedingly difficult to decide" and further admitting that as "outsiders [the Panel and the Vice

27  Provost] are asked to interpret what happened between two individuals during a brief encounter

28

over Christmas break in a city several thousand miles from campus as to which there were no other witnesses - a nearly impossible task."  Nonetheless, the Vice Provost undertook this "nearly impossible task" in his words – without ever conducting his own evidentiary hearing and without assessing the credibility of the parties.  He did so with the clear and biased goal of upholding the Findings and Sanctions.  In doing so, the Vice Provost went well beyond his authority by making findings of fact that he had no indication the Panel even considered, and even made findings of fact that were outside the scope of the charges set forth in the notice served on John Doe.  Whereas the charging document served on John Doe asserted that he "engaged in sexual intercourse with [Jane Smith] without her consent and initiated sexual acts while she was asleep" the Vice Provost made findings of fact and imposed discipline based on supposed events that were outside the scope of those charges.  Specifically, the Vice Provost, after finding that removing her underwear could reasonably be interpreted as permission to engage in sexual intercourse especially given Jane Smith's other nonverbal cues, nonetheless claimed that he had found that John Doe repeatedly placed Jane Smith's hand on his penis while she was awake.  Such an action is neither "sexual intercourse" nor "sexual acts while she was asleep."  John Doe was therefore given no notice by Stanford that he was being charged with this extraneous allegation until the Vice Provost's appeal decision was issued.

28.     In addition, the Vice Provost ultimately increased the disciplinary penalty imposed on John Doe, despite the lack of any authority under ARP §XV to impose additional sanctions.  ARP §XV mentions nothing about the Vice Provost's authority to increase the sanctions imposed by the Panel, which is further evidence of bias since the risk of additional penalties would deter an accused from exercising their right to appeal.  Yet, under the Vice Provost Decision, John Doe received the further penalty of being immediately ejected from campus, a two-year delay on the conferral of his undergraduate degree, and having to undergo training in prevention of sexual harassment and sexual violence, consent, and "bystander awareness" if he was to continue as a graduate student.   Without any authority, the Vice Provost

imposed this unfair discipline despite having to begrudgingly admit that the evidence did not support Jane Smith's allegation of rape against John Doe.

29.     The Vice Provost Decision does not explain how the conflicting evidence and the lack of any specific factual findings based on specific evidence in the Findings and Sanctions met the preponderance of evidence standard to support that the Panel reached a "reasonable" conclusion in its Findings and Sanctions.  The Vice Provost Decision does not explain the decision to increase the severe penalties imposed by the Panel on John Doe.  The Vice Provost addressed only two of the numerous claims in the appeal against Jane Smith' credibility, and did so dismissively and improperly.  Notably, the Vice Provost ignored John Doe's assertion that Jane Smith's fractured emotional state prior to the incident in question could explain her motivation to make a false accusation, and could also explain her supposed distress that the Vice Provost incorrectly attributed to her fabricated assault claim.  The Vice Provost's failure to carefully examine all of the evidence available to Stanford violated John Doe's right to a fair proceeding.

30.     The Vice Provost Decision reveals a fundamentally flawed appellate review in which the Vice Provost "interpreted" events of which he did not even have the level of knowledge that the Panel had, who at least personally considered some of the testimony and evidence offered by the parties.  Therefore, it is not surprising that the Vice Provost Decision is full of contradictions and inconsistencies.  For example, the Vice Provost Decision concludes that John Doe did not act with malice, yet without basis concluded that he sexually assaulted Jane Smith.  The Vice Provost Decision also fails to adequately explain how Jane Smith did not consent to the sexual conduct by removing her clothing, crawling into bed with John Doe, pressing her body against him, then admittedly removing her underwear and never telling John Doe that she did not consent to sexual conduct.  These inconsistencies reveal the Vice Provost's prejudicial abuse of discretion in issuing the Vice Provost Decision.  Stanford's and the Vice Provost's bias against John Doe are further evidenced by his failure to act on John Doe's claims of sexual harassment and stalking by Jane Smith.

31.     The Vice Provost Decision is also riddled with inaccuracies that are easily and indisputably proven, even including errors in attributing statements to John Doe that were in fact made by Jane Smith, and stating that a witness had supported the claim that Jane Smith had told third parties that John Doe placed Jane Smith's hand on his penis, when in fact no witness supported that claim. Again, this claim was also outside the scope of the charging documents and should not have been considered at all, based on the failure to give notice of the charge.

32.     In addition, the Vice Provost ignored a clear conflict of interest that disqualified him from considering the appeal in this matter.  The Vice Provost oversees the Office of Community Standards and supervises staff involved with the student judicial process, creating an obvious conflict of interest.  Given his role within the Office of Community Standards, the Vice Provost is predisposed to overlook criticisms of the Office of Community Standards program and processes and is simply not an impartial arbiter of the conduct of the Panel.  The inherent bias in the ARP of having the Vice Provost review the Panel's decisions violated John Doe's right to a fair hearing and procedural due process.

33.     As a legal result of Stanford's actions, John Doe has suffered severe injury and damage in an amount to be proven at trial.  John Doe's injury and damages were compounded by Stanford's failure throughout the process to protect the confidentiality of the disciplinary proceedings, including failing to require Jane Smith to maintain confidentiality, as required by Stanford's own ARP.  In fact, on information and belief, in response to an email message about disclosure of information, the Dean of Student Life told Jane Smith, "I think you should do what you believe will begin the healing process."

### FIRST CLAIM FOR RELIEF
### DISCRIMINATION IN VIOLATION OF 20 U.S.C. §1681 (TITLE IX)

34.     John Doe incorporates by reference the allegations of all prior paragraphs, as if fully set forth here.

35.     John Doe is informed and believes, and on that basis alleges, that Stanford receives financial assistance from the United States, so Stanford is subject to Title IX of the Education Amendments of 1972 ("Title IX"), codified at 20 U.S.C. §§1681 *et seq.*  By engaging

in the misconduct alleged above, Stanford discriminated against John Doe in violation of 20 U.S.C. §1681, which provides in relevant part that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."

36.     Stanford's treatment of John Doe as alleged above violated Title IX.  Stanford acted out of a gender bias against John Doe because he was a male student.  Stanford discriminated against John Doe because of Stanford's desire to portray Stanford as aggressive in prosecuting supposed Title IX violations claimed by female students due to purported sexual assaults by male students.  Stanford's rush to judgment against John Doe was designed to avoid further negative publicity relating to Stanford's prior failure to adequately address on-campus sexual assault claims.  Stanford's biased conduct violated Stanford's Code of Conduct, which requires honesty, accuracy, and fairness at all times.

37.     Stanford is liable for punitive damages because Stanford acted with deliberate indifference to John Doe's right to be free from gender discrimination and with conscious or reckless disregard of John Doe's right to a fair proceeding.

38.     As a result of Stanford's Title IX violation, John Doe is entitled to compensatory damages, punitive damages and attorney fees in an amount to be proven at trial.

**SECOND CLAIM FOR RELIEF**
**BREACH OF CONTRACT**

39.     John Doe incorporates by reference the allegations of all prior paragraphs, as if fully set forth here.

40.     When John Doe matriculated at Stanford, Stanford entered into a written and implied contract with John Doe in which Stanford agreed to respect John Doe's rights and to treat John Doe with basic fairness.  The written portion of the contract is set forth in the ARP and applicable written policies and procedures promulgated by Stanford.  The implied portion of the contract arose from Stanford's conduct while John Doe was a student at Stanford, including but not limited to Stanford's representation that would treat John Doe fairly.

41.     John Doe performed all contractual obligations that he owed to Stanford to the extent those obligations were not excused by Stanford's breach.

42.     Stanford breached the written and implied contract in a variety of ways, as alleged above, including but not limited to exceeding its jurisdictional limit in pursuing a disciplinary action under the ARP, failing to provide a fair investigatory and adjudicatory proceeding, and in imposing the penalties on John Doe.

43.     John Doe suffered damages in an amount to be proven at trial as a result of Stanford's breach of its contract with John Doe by imposing unfair discipline on John Doe following a flawed evidentiary hearing and appellate review conducted by Stanford in excess of its jurisdiction pursuant to the unlawful ARP.

### THIRD CLAIM FOR RELIEF
### BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING

44.     John Doe incorporates by reference the allegations of all prior paragraphs, as if fully set forth here.

45.     When John Doe matriculated at Stanford, Stanford entered into a written and implied contract with John Doe in which Stanford agreed to respect John Doe's rights and to treat John Doe with basic fairness.  California law implies a covenant of good faith and fair dealing in all contracts between parties entered into in the State of California.  As a result of Stanford's actions set forth herein which violated John Doe's right to a fair hearing, Stanford violated the implied covenant of good faith and fair dealing contained in its contract with John Doe.

46.     John Doe suffered damages in an amount to be proven at trial as a result of Stanford breach of the covenant of good faith and fair dealing by imposing unfair discipline on John Doe following a flawed evidentiary hearing and appellate review conducted by Stanford in excess of its jurisdiction pursuant to the unlawful ARP.

**FOURTH CLAIM FOR RELIEF**
**NEGLIGENCE**

47.    John Doe incorporates by reference the allegations of all prior paragraphs, as if fully set forth here.

48.    Stanford owed a duty of care to John Doe to design and implement a fair investigatory and adjudicatory process regarding Jane Smith's allegations against John Doe.

49.    Stanford breached its duty of care to John Doe in a number of ways, including but not limited to the following:

a.    negligently misrepresenting to John Doe that Stanford would treat him fairly and in a manner that respected his rights, including his constitutional right against self-incrimination under the Fifth Amendment and his right to a procedural due process and a fair hearing;

b.    negligently conducting the disciplinary proceeding under the ARP against John Doe;

c.    negligently inflicting emotional distress on John Doe.

50.    As a legal result of Stanford's negligence, John Doe suffered damages in an amount to be proven at trial.

**FIFTH CLAIM FOR RELIEF**
**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

51.    John Doe incorporates by reference the allegations of all prior paragraphs, as if fully set forth here.

52.    This disciplinary action taken by Stanford against John Doe, as alleged above, is extreme and outrageous conduct with the intention of causing, or in reckless disregard of the probability of causing, John Doe to suffer emotional distress.

53.    As the legal result of Stanford's conduct, John Doe suffered severe or extreme emotional distress.

54.    Stanford engaged in the disciplinary action against John Doe out of malice, oppression and/or fraud under California Civil Code §3294, so as to be liable for punitive and exemplary damages.

55.     Accordingly, John Doe is entitled to compensatory and punitive damages in an amount to be proven at trial.

## PRAYER

Wherefore Plaintiff John Doe prays for judgment as follows:

1.     For compensatory general and special damages and punitive damages in an amount to be proven at trial;

2.     For reasonable attorney fees and legal costs pursuant to 42 U.S.C. §1988 or other applicable authority; and

3.     For such other and further relief as the Court deems just and proper.

DATED:  April 25, 2016                                   QUADRA & COLL, LLP


By:   */s/ Rebecca Coll*
    JAMES A. QUADRA
    REBECCA COLL
    Attorneys for Plaintiff John Doe


## DEMAND FOR JURY

Plaintiff hereby demands a trial by jury.

DATED:  April 25, 2016                                   QUADRA & COLL, LLP


By:   */s/ Rebecca Coll*
    JAMES A. QUADRA
    REBECCA COLL
    Attorneys for Plaintiff John Doe